MILES CITY BANK, RESPONDENT, v. ASKIN, APPELLANT.

No. 8689

Submitted February 18, 1947. Decided March 17, 1947.

179 Pac. (2d) 750

Mr. W. B. Leavitt, of Miles City, and Mr. F. F. Haynes, of Forsyth, for appellant.

Mr. George W. Farr, of Miles City, and Mr. Denzil R. Young, of Baker, for respondent.

MR. JUSTICE CHEADLE delivered the opinion of the Court.

Action for recovery on a check alleged to have been drawn by the defendant on the Bank of Baker, Montana, payment of which was stopped by defendant. From an adverse judgment, defendant appeals.

The complaint alleges the execution and delivery, by defend-

ant, to J. W. Clark, of a check in the amount of $5,000, dated January 6, 1945, drawn on the Bank of Baker, the negotiation of such check, on the same day, to plaintiff; that plaintiff bank, in the usual course of its business, cashed the check and paid the drawee the amount thereof, since which date plaintiff has been the owner and holder thereof; that said check was presented to the drawee bank for payment, which was refused; that prior to presentment, the defendant countermanded its payment by instructing the drawee bank to refuse payment. The complaint further alleges demand upon defendant, and his refusal of payment.

By his answer defendant denies generally the material allegations of the complaint, and specifically that he made, gave or delivered to J. W. Clark or any other person the alleged check; admits that the drawee bank refused payment of the alleged check, at his direction. For a first affirmative defense, defendant alleges that he did not utter or give to J. W. Clark the alleged check or any check for $5,000; that he was not indebted to said Clark in said or any amount; that if his signature is on said check, which he denies, the check was changed after being signed, without his knowledge or consent, and that he countermanded payment before presentment.

For a second affirmative defense, defendant alleges that at the time plaintiff paid the alleged check same had not been accepted or guaranteed by the drawee bank, and that plaintiff knew that payment could be stopped by defendant at any time prior to presentment and acceptance; that on information and belief, the said Clark was not a customer of or depositor in plaintiff bank; that plaintiff was not required to pay cash on presentation of the alleged check, but it could, and in the exercise of ordinary diligence and in the usual and ordinary course of business, should have sent the check for collection, and should have received the proceeds thereof before paying Clark any thereof, thereby protecting itself against loss; that in paying the alleged check in cash plaintiff was negligent, and any loss sustained was the result of its own negligence.

Upon plaintiff's motion, defendant's second affirmative defense was stricken. By reply, plaintiff denied every allegation of the first affirmative defense. The jury's verdict was in favor of plaintiff, for the full amount demanded.

The defendant assigns error by the trial court, (1) in striking the second affirmative defense; (2) in refusing evidence offered by defendant, and sustaining objections to certain questions propounded; (3) in refusing instructions requested by defendant, and giving instructions offered by plaintiff; (4) in entering judgment against defendant; (5) that the evidence is insufficient to sustain the verdict and judgment, which are contrary to law.

The circumstances under which plaintiff obtained the check were these: On January 6, 1945, Clark, the payee, presented the check to Vern Bublitz, teller of plaintiff bank, for payment. After identifying the check, Bublitz testified:

"Q. When did you first see it—when and where did you first see it? A. Well I got a date on here, '1/6/45,' showing this phone call '1/6/45,' January 6th, 1945.

"Q. And how did you come to see it? A. J. W. Clark presented it to me for payment for cash.

"Q. He presented it to you through the bank for payment? A. Yes, that's right.

"Q. And what did he say if anything? A. Well he just gave me the check,—he says, 'I would like to have you call up on that, it is a little large amount and I want you to call up on that because I want the cash for it,'—he said, 'I want the cash for it, and I would like to have you call up and see if that check is good.' "

The witness did call the drawee bank, and ascertained only that defendant's deposit was sufficient to pay the check. He further testified that he was not acquainted with defendant and had never heard of his business reputation or standing; that Clark had on several occasions presented Askin's checks for payment, none of which had been turned down. With ref-

erence to the usual practice in disposition of checks presented under similar circumstances, he said:

"Q. How, in the usual course of business, do you handle checks in the bank? A. What do you mean, taking in on deposit or cash?

"Q. Sending them through for collection or cashing them. A. What checks do you mean now, do you mean * * *

"Q. Any checks. A. Any checks?

"Q. Yes. A. Well, it depends.

"Q. Well, assuming a man has no account in your bank and has no deposit or does any business with the bank. A. Well, you know the check is good,—genuine, and the fellow has identification, and it is payable to him, you give him cash on it.

"Q. And you would give cash on a check of that size? A. Once in a very great while, yes.

"Q. Yes, but it is once in a very great while? A. Yes.

"Q. Your ordinary course of business would have been to send it through for collection and then wait until you realized on it and then pay Mr. Clark the money? A. Yes."

It was satisfactorily established that the check sued on bears the signature of the defendant.

The defendant testified that on the night of January 5th and the morning of January 6, 1945, he was at Leon Park, a resort on the outskirts of Miles City; that on that occasion J. W. Clark was dealing a blackjack or twenty-one game, in which defendant joined as a player. He identified two checks in the respective amounts of $150 and $1,000 signed by him, both payable to J. W. Clark, introduced in evidence as plaintiff's exhibits "B" and "C." According to defendant's testimony, he signed these checks and filled in the numerals indicating the amounts appearing behind the dollar sign, the rest being written in by Clark. In this connection defendant stated that he was unable to write the word "thousand." These checks, as well as the one sued on, were written in lead pencil, all made payable to Clark and indorsed by him. These were cer-

tified as original exhibits on the appeal and are before us as a part of the record.

Defendant testified that on the same night he wrote one other check in the amount of $150, payable to Clark. This, and exhibits "B" and "C" were delivered to Clark in payment for chips used in the blackjack game. This check was not presented for payment, and defendant was under the impression that Clark tore it up when defendant, during the game, turned in chips to redeem it.

Defendant does not deny that his signature appears on the check sued on, but does deny that he signed a check for the amount of $5,000 payable to Clark, or that he at any time owed Clark that sum. It is his belief, as indicated by his testimony, that the $150 check was not, in fact, destroyed by Clark, and was raised to $5,000. He testified upon interrogation by the trial judge:

"Q. Do you claim that check was raised or altered? A. It had to be something, I never saw that check before.

"Q. What amount do you claim it was altered from? A. One hundred and fifty dollars, I claim.

"Q. You claim it was written 'one hundred and fifty dollars'? A. Yes, I think it was."

He testified positively that he wrote only three checks that night, and had never given Clark a signed blank check. Also, that at the conclusion of the game he was indebted to Clark to the extent of $1,000, and delivered exhibit "C" to him in full payment. This check is indorsed by both Clark and Leon Brothers, the operators of the resort. According to testimony of Louis B. Leon, it was delivered to him by Clark, and deposited in the account of Leon Brothers in the First National Bank of Miles City.

The check in suit is in words and figures as follows:

*BAKER, MONTANA* Jan. 6, *1945*. *No.* ⸺

 *THE BANK OF BAKER 93-510*

*Pay to the*

 *order of* J. W. Clark $ 5000.00/xx

Five Thousand dollars 100/xx *Dollars*

 (ok) Phone call 1-6-45

*Counter Check* Geo. F. Askin

 Check Irregular

 Maker disclaims.

The portion italicized is printed, the balance being written in lead pencil. The words ''(ok) Phone call 1-6-45'' were written by the witness Bublitz, the then teller of plaintiff bank. The words ''Check Irregular Maker disclaims'' were written by an employee of the drawee bank.

The witness Bublitz testified that the check when admitted in evidence was in the same condition and appearance as when presented for cashing by Clark, with the exception of the writings placed thereon by Bublitz and an employee of the drawee bank. A casual examination of the exhibit discloses that it had apparently been changed, after being written, in the following particulars:

1. The written words ''Five Thousand'' and the figures ''5000/xx'' are obviously written with a different pencil than the balance of the writing, being distinctly blacker, heavier and more distinct than the other writing.

2. That portion of the face of the check underlying the words ''Five Thousand'' and the figures ''5000/xx,'' bears obvious signs of erasure of the words and figures originally occupying such spaces.

Other circumstances appear to support defendant's contention that the check was changed after being written. The physical appearance of the check, as compared with other checks in evidence in which the numerals were written by the defendant, would seem to raise the question of whether or not the figures ''5000.00'' were written by a person other than the

defendant. The ciphers appearing therein are of a marked difference in shape and character from those appearing on exhibit ''C,'' admittedly written by the defendant and on the latter exhibit the three ciphers are connected by lines at the top, thus, ''0 0 0,'' while those in exhibit ''A'' are written without connecting lines, thus ''0 0 0.'' We think these circumstances, in conjunction with other evidence, were sufficient to require the determination by the jury, in conjunction with the ultimate question as to whether plaintiff was a holder in due course, the question as to alteration of the check.

The rulings and instructions of the trial court evidence a presumption by the court that plaintiff was a holder of the check in due course. In view of the suspicious circumstances surrounding the presentment of the check, a serious question is presented as to whether plaintiff can or may be considered a holder in due course. Among such circumstances are the facts that Clark was not a depositor in plaintiff bank and had no account there; that the check of such an amount was written in pencil; that plaintiff's teller, who cashed the check, was not acquainted with the defendant or his signature; that he was only acquainted with Clark by sight, and, so far as the record discloses, was ignorant of the nature of Clark's business, associations, background or financial responsibility; the insistence of Clark in obtaining cash immediately; and, of course, the apparent alterations of the check. In spite of such circumstances, Bublitz cashed the check, without making inquiries which naturally suggest themselves, instead of following the logical, prudent and sensible procedure of forwarding the instrument to the payee bank for collection or certification.

Section 8459, Revised Codes 1935, provides what constitutes a holder in due course, as follows:

''A holder in due course is a holder who has taken the instrument under the following conditions:

''1. That it is complete and regular upon its face;

''2. That he became the holder of it before it was overdue,

and without notice that it has been previously dishonored, if such was the fact;

"3. That he took it in good faith and for value;

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 8463 provides: "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Section 8531 provides: "Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided, except as against a party who has himself made, authorized, or assented to the alteration, and subsequent indorsers.. But when an instrument has been materially altered and is in the hands of a holder in due course, not a party to the alteration, he may enforce payment thereof according to its original tenor."

Section 8532 provides:

"Any alteration which changes: * * *

"2. The sum payable, either for principal or interest * * * is a material alteration."

In view of the evidence, can it be said that the check in suit ■■ is "regular upon its face," and that the plaintiff bank had no notice of any infirmity in the instrument, and took it in good faith? We think these questions are determinative, and unless the answers be in the affirmative, the plaintiff cannot be considered a holder in due course. Under the circumstances shown here, the question of whether, or not, plaintiff is a holder in due course should have been determined by the jury. It will not be presumed that any alteration was made prior to delivery, and with the assent of the maker. As is said in Klebba v. Otto, Mo. App., 187 S. W. (2d) 499, 501:

"It is contended that the note shows on its face that it has

been materially altered in that the second '1' in the figure 11 was changed to a 4 by the use of a different pen and ink from that used in other parts of the note. The rule has been stated in Meffert v. Lawson, 289 Mo. 337, loc. cit. 361, 233 S. W. 31, 38, as follows: 'The ancient rule of evidence, as stated and discussed by Mr. Greenleaf (1 Gr. Ev., sec. 564), was that alterations and erasures of written instruments were presumed to have been made at or prior to the time of their execution. The trend of authority is still in favor of the rule as thus declared. However, where an alteration or erasure appears suspicious on its face—for example, where a different ink has been employed at the point of erasure from that elsewhere used in the instrument—it demands explanation. In the presence of this, or equally cogent circumstances of a suspicious nature, the law presumes nothing, and the question as to the time when the person by whom, or the interest for which, the alteration was made are matters of fact to be found by the jury upon proof adduced *by the party offering the instrument in evidence.*' (Italics ours.)

"In Kircher v. Dunnington, 325 Mo. 355, loc. cit. 363, 29 S. W. (2d) 138, it is held that when the ink in which an interlineation or addition is written is different from that used in the body of the instrument, and such addition is in a different handwriting from that of the body of the instrument, it is deemed sufficient evidence to raise such a suspicion of the validity of the instrument as to require explanation thereof before the instrument can form the basis of a judgment. To the same effect see Lampe v. Franklin American Trust Co., 339 Mo. 361, loc. cit. 377, 96 S. W. (2d) 710, 107 A. L. R. 465 and Otten v. Otten, 348 Mo. 674, loc. cit. 678, 156 S. W. (2d) 587.

"An unauthorized material alteration in a note such as a change in the date, avoids the instrument. Sections 3139 and 3140, R. S. Mo. 1939, Mo. R. S. A. [The Missouri sections referred to are identical with sections 8531 and 8532, Rev. Codes of Montana, 1935.] In the case at bar the alteration is apparent

on the face of the instrument because of the different ink used. Plaintiff stated in effect on cross-examination that it had been altered after he himself wrote it. Defendant stated that the date had been changed after he signed it. The burden was on plaintiff to offer evidence tending to explain the alteration and, failing to offer any evidence on the subject, he failed to make a prima facie case.''

Ordinarily the question of whether a particular alteration ▮▮▮ is, or not, manifest or visible is one of fact for the jury, unless there can be no reasonable difference of opinion in which case it becomes a question of law. Paton's Digest of Legal Opinions, Vol. I, p. 107; Chamberlain v. Greer, 135 Wash. 340, 237 Pac. 719. We therefore conclude that the ultimate question of whether or not plaintiff is a holder in due course must be determined by the jury, such determination to be based upon its findings as to whether, (1) the check was, in fact materially altered subsequent to its execution and delivery, and (2), if so, was such alteration so manifest and visible as to reasonably impart notice to plaintiff of· an irregularity of and infirmity in the check. Should the jury find that the instrument had been materially altered after its execution and delivery, but nevertheless that plaintiff was a holder in due course, not a party to the alteration, then plaintiff should be allowed recovery according to its original tenor (sec. 8531, Rev. Codes), to be established by available evidence. General Motors Acceptance Corp. v. Talbott, 39 Ida. 707, 230 Pac. 30. For other cases involving the question of whether an altered negotiable instrument was acquired and held in due course, see New Rochelle Securities Co. v. Mayer, 270 N. Y. 52, 200 N. E. 71; National Ulster County Bank v. Madden, 114 N. Y. 280, 21 N. E. 408, 11 Am. St. Rep. 633; Charleston Paint Co. v. Exchange Banking & Trust Co., 129 S. C. 290, 123 S. E. 830; Chamberlain v. Greer, supra; Park v. Park, Mo. App., 190 S. W. (2d) 285; Mitchell v. Reed's Ex'r et al., 106 S. W. 833, 32 Ky. Law Rep. 683; Idaho State Bank v. Hooper Sugar Co., 74 Utah 24, 276 Pac. 659, 68 A. L. R. 969; see also Daniels on Negotiable Instruments,

Vol. 2, sec. 924; Brady on Bank Checks, sec. 146, p. 221, n. 52.
And we think that should the jury find that the alteration
 was so obvious as to impart notice thereof to plaintiff, it
might well conclude that plaintiff's action amounted to bad
faith toward the defendant; certainly, in such event, it must
conclude that cashing the check amounted, at the least, to
gross negligence. Should plaintiff prevail, the defendant is
deprived of any legitimate defense he might otherwise have
asserted.

For the reasons indicated we hold that the evidence was in-
 sufficient to sustain the verdict and judgment, which are
contrary to law, and a new trial must be had to present the
decisive issues as above outlined.

We think the trial court erred in its instruction No. 8, which
 has to do with the right of the holder of a negotiable in-
strument, wanting in any material particular, to complete it
by filling in the blanks. While this may be correct as a general
proposition, it has no application here on the basis of the evi-
dence, and may well have been misleading to the point of pre-
judice. We think also that instruction No. 20 is misleading.
It reads: "You are insructed that while under the law the de-
fendant had the right to countermand the payment of the check
in question, if you find from the evidence that the defendant
is the maker of the check, but in countermanding payment he
took upon himself all the consequences of his act and such
countermanding of payment does not affect his liability to a
holder in due course." This wording seems to assume that
plaintiff is a holder in due course, and practically advises the
jury to such effect. Standing alone, this instruction is objec-
tionable for that reason. Such objection would be removed by
coupling with it other instructions to the effect that the de-
termination of whether plaintiff is a holder in due course is for
the jury and outlining the basis of such determination.

We further conclude that the trial court erred in refusing
 evidence offered to prove that in cashing the check as it
did the plaintiff bank departed from the usual and ordinary

course of business adopted and usually adhered to by plaintiff. Under the circumstances of this case, such evidence is competent at least as bearing upon the negligence of plaintiff in cashing the check, instead of forwarding it for collection, as dictated by caution and plain common sense. We do not wish to be understood as establishing the rule that such evidence is admissible in all cases where a bank cashes checks drawn on another bank. But it is admissible in cases where, as here, a bank cashes such a check which is both drawn by and payable to strangers to such bank, as bearing upon the question above suggested. For this reason, the trial court should have refused plaintiff's motion to strike defendant's second affirmative defense. See Morse on Banks and Banking, 6th Ed., Vol. 2, sec. 460A. Even without such defense, we think this evidence admissible under the pleadings, in view of the allegation of the compalint that the check was received and cashed in the usual course of its business.

Appellant assigns error in the refusal of certain instructions offered by him. We deem it unnecessary to encumber the record with a discussion of such assignment, since a re-trial will proceed on theories differing from those adopted by the court at the first trial.

The judgment is reversed, and the cause remanded for a new trial.

Mr. Chief Justice Adair and Associate Justices Choate, Angstman, and Metcalf, coucur.

Rehearing denied May 1, 1947.